1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

EDUARDO GARCIA,

Plaintiff,

v.

NAVY FEDERAL CREDIT UNION,

Defendant.

Case No. 23-cv-2017-MMA-BLM

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NFCU'S MOTION FOR SUMMARY JUDGMENT**

[Doc. No. 64]

On January 10, 2025, Defendant Navy Federal Credit Union ("Defendant NFCU" or "NFCU") filed a motion for summary judgment in this action. Doc. No. 64. Plaintiff Eduardo Garcia ("Plaintiff") filed a response in opposition, to which Defendant NFCU replied. Doc. Nos. 81–82. The Court found the matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7.1.d.1 and took it under submission on February 25, 2025. Doc. No. 86. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for summary judgment.

# I. Background[1]

Plaintiff obtained an NFCU checking account on August 3, 2018, and an NFCU savings account on September 18, 2017.  Doc. No. 81-4 ("Defendant's Separate Statement" or "DSS") No. 1.  He enrolled both accounts in NFCU's mobile banking service(s) on August 3, 2018, and in doing so accepted NFCU's Terms and Conditions for Mobile Banking.  DSS No. 2; *see* Doc. No 68-1.

On August 23, 2023, Plaintiff received text messages from an unknown number stating that an unauthorized user was attempting to transfer funds via Zelle from his NFCU checking account.  DSS No. 3; Doc. No. 66-1 ("Garcia Depo. Tr.")[2] 49:7–51:8; Doc. No. 81-2 at 32.  Plaintiff then received a phone call from an unknown individual inquiring as to whether Plaintiff had authorized any Zelle transfers.  DSS No. 4; Garcia Depo. Tr. 49:7–51:22.  The caller also inquired as to Plaintiff's date of birth, Social Security number, and other personal information.  DSS No. 5; Garcia Depo. Tr. 53:1–53:9.  Plaintiff provided the caller this information, believing them to be an NFCU representative.  *See* DSS No. 5; Garcia Depo. Tr. 51:9–51:22.

That same day, a personal loan application for $9,800 and corresponding "ePromissory" note was signed and submitted electronically in Plaintiff's name, using a "non-historical"[3] device and the IP address 45.164.23.89.  DSS No. 6; Doc. Nos. 68-2–68-3; Doc. No 66-8 ("Holley Depo. Tr.")[4] 48:18–48:25[5]; Doc. No. 66-15 ("Uzzle Depo.

---

[1] These material facts are taken from Defendant NFCU's separate statement of undisputed facts and Plaintiff's responses thereto, as well as the parties' supporting declarations and exhibits.  Facts that are immaterial or not genuinely disputed are not included in this recitation.  To the extent any such facts are nevertheless relevant to the Court's analysis, they are discussed as appropriate *infra*.

[2] Doc. Nos. 66-1–66-7 and Doc. No. 81-2 at 43–84 contain the transcript of Plaintiff's deposition in this matter.  The Court refers to them hereinafter collectively as "Garcia Depo. Tr." and references them by their transcript pagination and lineation.

[3] The parties use the term "historical device" to mean "one historically and repeatedly used to access a member's account without issue."  DSS No. 6.  A "non-historical device" is one not historically and repeatedly used to access the member's account without issue.

[4] Doc. Nos. 66-8–66-14 and Doc. No. 84-3 contain the transcript of Defendant NFCU Fraud Investigator Kiona Holley's deposition.  The Court refers to them hereinafter collectively as "Holley Depo. Tr." and references them by their transcript pagination and lineation.

[5] Holley also refers to the device as a "fraud device or fraud cookie."  Holley Depo. Tr. 48:20–48:21.

Tr.")[6] 19:22–20:9; Doc. No. 67 ("Uzzle Decl.") ¶ 6; Doc. No. 81-1 at 10.[7]  NFCU approved the loan ("Loan") and deposited the $9,800 into Plaintiff's NFCU checking account.  Doc. No. 81-1 at 10; Doc. No. 63-3 at 3; *see also* Doc. No. 68-4.  Next, a total of $4,500 was transferred from Plaintiff's NFCU checking account to the account of a Karnaisa K. Whitehead ("Whitehead") in two transactions of $1,500 and $3,000, respectively.  Doc. No. 68 ("Paulson Decl.") ¶ 12.  Thereafter, $4,000 was also transferred to Plaintiff's Apple Cash account from his NFCU checking account.  Doc. No. 63-3 at 3–4; Holley Depo. Tr. 34:18–34:22; *see* DSS No. 8; Doc. No. 81-1 at 55.  Two days later, on August 25, 2023, Plaintiff transferred $1,300 to his NFCU savings account from his NFCU checking account.  Doc. No. 63-3 at 3; Holley Depo. Tr. 55:14–56:5.  The transfers to Whitehead utilized a non-historic device with IP address 45.164.23.89.  DSS. No. 8.  The transfers to Plaintiff's Apple Cash account and savings account utilized a historic device.  *Id.*

The night of August 23, 2023, NFCU's "Guardian" alert system flagged the $1,500 and $3,000 transfers to Whitehead as suspicious.  Doc. No. 66-18 ("Freeman Depo. Tr.")[8] 46:2–46:22.  The Guardian system referred the flag to NFCU Fraud Investigator Micah Freeman.  Freeman Depo. Tr. 45:13–46:24.  However, a total of $1,702 was ultimately depleted from Whitehead's account using the CashApp person-to-person money transfer application before NFCU could freeze the account.  DSS No. 9; Holley Depo. Tr. 52:12–52:17.  NFCU placed a hold on the remaining $2,797.93 and eventually recovered these funds.  *Id.*; Uzzle Decl. ¶ 10, 15; DSS 20.

Plaintiff filed a police report regarding the incident with the Oceanside, California Police Department the next day, August 24, 2023.  *See* Doc. No. 67-7 at 6–8 ("Police

---

[6] Doc. Nos. 66-15–66-17 and 84-4 contain the transcript of Rule 36(b) deponent, Defendant NFCU Senior Fraud Investigator Lisa Uzzle's deposition.  The Court refers to them hereinafter collectively as "Uzzle Depo. Tr." and references them by their transcript pagination and lineation.

[7] Except where otherwise noted, all citations refer to the pagination assigned by the CM/ECF system.

[8] Doc. Nos. 66-18–66-20 contain the transcript of Fraud Investigator Micah Freeman's deposition.  The Court refers to them hereinafter collectively as "Freeman Depo. Tr." and references them by their transcript pagination and lineation.

Records").[9]  Plaintiff also filed a "Declaration of Forgery/Fraud" form with NFCU on that date.  Doc. No. 67-3.  NFCU Fraud Investigator Kiona Holley was assigned to investigate Plaintiff's fraud claim.  DSS. 15; Doc. No. 63-3; *see* Holley Depo. Tr. 34:1–34:22.  Holley concluded that: "on or about [August 23, 2023], at 22:50:29 hours, the account was accessed via fraud client cookie[10] . . . . A [c]onsumer [l]oan account . . . for $9,800.00 was applied and the proceeds auto deposited into the members checking account."  Doc. No. 63-3.  Holley likewise concluded that though partial funds were transferred to Whitehead, "[f]urther investigation shows that $1,300.00 was transferred to member's savings account and $4,000.00 was sent out via Apple Cash.  Evidence shows that the Apple Cash transaction was done by member's historical device and the historical token was used . . . ."  *Id.*

Ultimately, NFCU denied Plaintiff's fraud claim because the Apple Cash transaction was done via a historical device.  *Id.*; Holley Depo. Tr. 36:1–36:4.  Consistent with that determination, NFCU issued Plaintiff a letter on or around August 28, 2023, notifying him that his claim was denied "based on account activity" and that he was responsible for the entire $9,800.  Doc. No. 67-5; *see also* Doc. No. 63-3.

On August 30, 2023, Plaintiff called NFCU and spoke to representative Laney Floyd regarding the Loan and subsequent transfers.  Doc. Nos. 68-6–68-7; *see* DSS No. 21.  Plaintiff stated that his identity was stolen and that he was attempting to find the original application for the Loan discussed above.  *See generally* Doc. Nos. 68-6–68-7.  Floyd discussed steps to access the Loan documents via the NFCU mobile application.  *Id.*

Plaintiff later sent NFCU a letter, dated August 30, 2023, regarding the incident.  Doc. No. 67-7; Doc. No. 81-2 at 19–30.  This letter consisted of, at minimum, a narrative

---

[9] Referring to this document, the Court refers to the first page of the Police Records as "1" and continues numeration from there.

[10] The Court understands the term "cookie," as used frequently throughout the briefing, to mean "access device" referred to by its unique identificatory quality, code, number, or virtual token.  *See* Holley Depo. Tr. 48:18–48:22; Doc. No. 84-5 ("Wielgus Depo. Tr.") 70:1–70:13.

letter authored by Plaintiff to Defendant NFCU, a copy of the Police Records, and a Federal Trade Commission ("FTC") Identity Theft Report.  Doc. No. 67-7; Doc. No. 81-2 at 19–30.[11]  In the narrative portion Plaintiff explains his version of events concerning the Loan and resulting transfers, demands "the categories of identifying information . . . used to complete the [loan] application . . ," and demands that NFCU "investigate this matter, resolve the loan, [] absolve him of all charges, take the steps required under the Fair Credit Reporting Act, and send [him] a letter explaining [NFCU's] findings and actions." Doc. No. 67-7 at 2–3; Doc. No. 81-2 at 24–25.  The FTC report includes Plaintiff's summary of the Loan and the events leading up to it.  Doc. No. 67-7- at 7; Doc. No. 81-2 at 27.

On September 18, 2023, NFCU issued Plaintiff a second letter, concerning his "request for a second review of [his] fraud claim."  Doc. No. 67-8 at 2.  Within, NFCU informed Plaintiff that it had "carefully review[ed]" the information he provided and determined that it made no error in denying his original fraud claim.  *Id.*  It further informed Plaintiff that NFCU held him responsible for "the full amount of the claim, $4,000."  *Id.*

By the end of August 2023, NFCU had begun to report the $9,800 Loan to the credit reporting bureaus as "belonging to Plaintiff."  DSS 24; Paulson Decl. ¶ 15. Between January 24 and February 1, 2024, NFCU received at least three credit reporting disputes[12] concerning the Loan.  Doc. No. 68-8.  Rendering findings on each, the assigned NFCU credit bureau dispute specialist determined that the disputed information was accurate as-is.  Paulson Decl. ¶ 16.

---

[11] The parties dispute whether Plaintiff attached additional items to this letter.  DSS No. 22; *compare* Doc. No. 67-7 *with* Doc. No. 81-2 at 19–30.

[12] Defendant asserts that it received 5 disputes over this matter.  Plaintiff counters that only 3 concerned the Loan, and that the others concerned extraneous matters.  DSS 25.  Upon review, it is unclear whether all reports submitted concern the Loan, as three contain the loan number ending in 3578.  Doc. No. 68-8; *see* Uzzle Decl. ¶ 5.  The two others correspond to accounts ending in 0712 and 2836.  *See, e.g.*, Doc. No. 68-8 at 12, 22.  Considering the parties' discussion of the disputes and the record as a whole, the Court determines that this dispute is not material.

"As of August 28, 2024, Plaintiff's loan balance was $2,238.84. His loan is currently due for July 27, 2025." Paulson Decl. ¶ 19. Every month, NFCU sends Plaintiff a monthly statement for the Loan. *Id.* at ¶ 20; Doc. No. 68-10. Because of its July 2025 due date, NFCU reports the Loan as "current" to credit reporting agencies. DSS 31; Paulson Decl. ¶ 21.

## II. EVIDENTIARY OBJECTIONS

Concurrent with its reply, Defendant NFCU filed objections to several items of Plaintiff's evidence. Doc. No. 83 ("Objections"). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). However, at the summary judgment stage, district courts consider all evidence with content that would be admissible at trial, even if the form of the evidence as presented would not be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (explaining that at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial."). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) and *Fraser*, 342 F.3d 1032 at 1036.).

First, the Court **OVERRULES** all of Defendant NFCU's hearsay objections. "[O]bjections such as lack of foundation, speculation, hearsay[,] and relevance are duplicative of the summary judgment standard itself." *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) (citing *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12CV146 L BLM, 2014 WL 1286561, at *16–17 (S.D. Cal. Mar. 31, 2014)); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

Next, the Court **OVERRULES** Defendant NFCU's objections to the Declaration of Christina Perez, Doc. No. 81-3 ("Perez Decl.") ¶¶ 4–7, 9–10, and 14, based on lack of

personal knowledge and foundation.

> [T]he requirement of personal knowledge imposes only a 'minimal' burden on a witness; if 'reasonable persons could differ as to whether the witness had an adequate opportunity to observe, the witness's testimony is admissible.' At summary judgment, the threshold is particularly low because all 'justifiable inferences' must be drawn in favor of the nonmoving party.

*Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013) (internal citations omitted). The Ninth Circuit has held "for example, that a plaintiff's verified complaint satisfies the personal knowledge requirement where the 'allegations were not based purely on . . . belief.'" *Id.* Reviewing Ms. Perez's declaration, she states that she participated in many of the underlying events in this matter. *See, e.g.*, Perez Decl. ¶ 6 ("Eddie and I went to several [NFCU] branch locations to get help[]"; "I explained to them that he did not take the money."). She also declares that she discussed the Loan, the fraud reports, and Plaintiff's feelings about the matter with him on multiple occasions. *Id.* ¶¶ 11, 12, 14. Based on her participation, the Court finds that Ms. Perez lays adequate foundation to opine on the relevant events and her impressions of Plaintiff's feelings. Likewise, as stated above, foundation objections are unnecessary at this stage. *Burch*, 433 F. Supp. 2d at 1119; *see also Obesity Research Inst.*, 310 F. Supp. 3d at 1107.

The Court also **OVERRULES** Defendant NFCU's objection to Plaintiff's Declaration, Doc. No. 81-2 at 1–4 ("Plf. Decl."), ¶ 7 based upon Federal Rule of Evidence 403. That rule provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Plaintiff, in his declaration, states that he "never actually had the $4,000 that was sent to my Apple Cash account because within minutes of the funds arriving, the fraudster took [it] out of the account." Plf. Decl. ¶ 7. Defendant NFCU argues that this statement should be excluded as "[v]ague, [a]mbiguous, and [u]ncertain." Objections at 2 No. 7. This appears not to

be an argument about the statement's actual vagueness, ambiguousness, or uncertainty, but instead a mere disagreement as to whether Plaintiff had legal possession of the funds. In any event, the Court finds that the factual content of this statement is neither vague, ambiguous, or uncertain.

Likewise, the Court **OVERRULES** Defendant NFCU's objections to Plaintiff's Declaration ¶¶ 11–12 and 18 based upon the "Best Evidence Rule," Federal Rule of Evidence 1002. Rule of Evidence 1002 mandates that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Here, none of the statements to which Defendant NFCU objects attempt to prove the contents of a writing, recording, photograph, or any other document. Instead, they describe actions Plaintiff took or observations he made. *See, e.g.*, Garcia Decl. ¶ 11 ("On August 30, 2023, I drafted a detailed dispute letter to NFCU because they had rejected my claim for identity theft."). While there may be documents relating to, or resulting from, these actions or events, Plaintiff does not attempt to prove their contents through the statements.

Finally, the Court **OVERRULES** Defendant NFCU's objections to Plaintiff's deposition transcripts based on a failure to authenticate them, namely, Plaintiff's failure to include the reporter's certification page. Plaintiff filed a notice of *errata*, which he indicates Defendant NFCU does not oppose, containing corrected transcripts with court reporter certifications. Doc. No. 84. Thus, the Court finds Plaintiff's deposition transcripts are properly authenticated.

### III. LEGAL STANDARD

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The court draws all justifiable inferences in favor of the non-moving party." *Fresno Motors, LCC v. Mercedes Benz*

*USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A genuine factual issue exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could return a verdict for the nonmoving party." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248). The court may not weigh the evidence or assess the credibility of witnesses. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must point to specific facts, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, showing that a genuine issue of material fact exists. *Devereaux*, 263 F.3d at 1076. More than a "scintilla of evidence" must exist to support the non-moving party's claims. *Pomona*, 750 F.3d at 1049 (quoting *Anderson*, 477 U.S. at 252). A showing of merely "some 'metaphysical doubt' as to the material facts as issue" will not suffice. *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Where the record . . . could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Pomona*, 750 F.3d at 1049–50 (quoting *Matsushita*, 475 U.S. at 587).

## IV. DISCUSSION

Defendant NFCU moves for summary judgment—at least in part—on each of Plaintiff's claims. *See generally* Doc. No. 64. In the alternative, it seeks summary adjudication on all those issues it addresses within. *Id.* Plaintiff opposes Defendant NFCU's motion. *See generally* Doc. No. 81. The Court will address each claim in turn.

### A. California Identity Theft Act – Claim 1

Defendant NFCU first moves for summary judgments on Plaintiff's claims under the California Identity Theft Act ("CITA"), arguing that Plaintiff lacks standing because: (1) he is not a victim of identity theft; and (2) Defendant NFCU is not a "claimant"

pursuant to CITA.  Doc. No. 64 at 15–16.  Defendant NFCU also argues that, even should he prevail, Plaintiff cannot collect civil penalties because it diligently investigated his identity theft claim.  Doc. No. 16–17.

### 1.     *Victim of Identity Theft*

CITA provides that "[a] person may bring an action against a claimant to establish that the person is a victim of identity theft in connection with the claimant's claim against that person."  Cal. Civ. Code § 1798.93(a).  Under CITA, a "victim of identity theft" is "a person who had their personal identifying information used without authorization by another to obtain credit, goods, services, money, or property, and did not use or possess the credit, goods, services, money, or property obtained by the identity theft . . . ."  Cal. Civ. Code § 1798.92(d).  That person must also file an FTC Identity Theft Report or police report concerning the alleged theft.  *Id.*  A "claimant" is "a person who has or purports to have a claim for money or an interest in property in connection with a transaction procured through identity theft."  *Id.* at § 1798.92(a).

The Court first finds that it is not genuinely disputed that Plaintiff filed an FTC Identity Theft Report.  *See* Doc. No. 67-7; Doc. No. 81-1 at 37–38.  As to the remaining "victim of identity theft" criteria, Defendant NFCU asserts that the undisputed facts establish that Plaintiff transferred $4,000 of the Loan proceeds to his Apple Cash account and $1,300 to his savings account, and thus that he "authorized," "used," or "possessed" the proceeds, rendering him wholly ineligible to proceed under CITA.  Doc. No. 64 at 15–16.  Plaintiff contends that those two transfers should not preclude him from relief, as CITA claim is "based on the remaining $1,702.07 in [Loan] principal," after asserting that he used the $1,300 and $4,000 to make payments on the loan.  Doc. No. 81 at 15.

First, as to the question of authorization, viewing the evidence in Plaintiff's favor, a jury could find that Plaintiff did not authorize the Loan.  Various NFCU employees at deposition testified that a "fraud cookie" was responsible for the Loan.  *See, e.g.*,  Holley Depo. Tr. 62:10–62:25, 68:21–68:22.  Plaintiff also provides consistent statements to the same effect, supported by other evidence.  *See, e.g.*, Plf. Decl. ¶¶ 5–6; Doc. Nos. 67-3,

67-7.  Thus, to the extent Defendant NFCU seeks summary judgment on the ground that Plaintiff authorized the Loan, it is not entitled to summary judgment.

Next, the parties dispute: (1) the applicable definition of "use" and "possess"; and (2) whether CITA requires that Plaintiff have "used" or "possessed" the entire Loan amount to render him ineligible for relief.  To date, there has been little development on this requirement.  Plaintiff argues in favor of a definition of "use or possess" equivalent to the Electronic Funds Transfer Act's definition of "benefit"—that statute's somewhat similar bar to relief.  Doc. No. 81 at 15 (citing *New York by James v. Citibank, N.A.*, No. 24-CV-659 (JPO), 2025 WL 251302 *16–18 (S.D.N.Y. Jan. 21, 2025)).  He points to *New York City by James*, assessing a consumer's "benefit[ting]" from a transaction under the federal Electronic Funds Transfer Act, to argue that the mere deposit of money into Plaintiff's account should not be considered a "benefit" unless he receives some additional downstream benefit, such as making purchases, reducing an existing debt, etc. *Id.*  As Defendant NFCU counters, however, this is distinctly different from CITA's phrasing, that a victim of identity theft "not use or possess the credit, goods, services, money, or property obtained by the identity theft . . . ."  Cal. Civ. Code § 1798.92(d). *New York City by James* is thus not helpful.

When interpreting California law, the Court's duty is to "ascertain and effectuate legislative intent."  *Hughes v. Bd. of Architectural Examiners*, 952 P.2d 641, 649 (Cal. 1998).  In doing so, the Court must first look to the text and the Legislature's explicit choice of words and apply them based upon plain and commonsense meaning.  *Id.*; *see, e.g.*, *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1092–92 (9th Cir. 2008).  If the statutory language is unambiguous, there is no need for further inquiry.  *Hughes*, 952 P.2d at 649.  When a statute is ambiguous, however, the Court may "consider evidence of the Legislature's intent beyond the words of the statute . . . including the statutory scheme of which the provision is a part, the history and background of the statute, [and] the apparent purpose . . . ."  *Id.*  "A statute is regarded as ambiguous if it is capable of two constructions, both of which are reasonable."  *Id.*

As to the first question of statutory interpretation, the Court determines that both the definitions of "use" and "possess" are readily obtainable when their commonsense dictionary meaning is applied to the text.  As to "use," Black's Law Dictionary provides several relevant definitions: "(1) The application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional; . . . (3) [a] purpose or end served and (4) [a] benefit or profit; esp., the right to take profits from land owned and possessed by another . . . ."  Black's Law Dictionary (7th ed. 1999); *cf. Nielsen Constr. Co. v. Int'l Iron Prods.*, 22 Cal. Rptr. 2d 497, 498 (Cal. Ct. App. 1993) (utilizing Black's Law Dictionary in interpreting California law); *AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1267 (Cal. 1990) (same).  Taking these definitions into account, and the term's usage in everyday language, the Court finds that "use" in this statute is best interpreted as the purported victim's employment of the property obtained by identity theft to accomplish a purpose or end, or that person's deriving a profit from it.  As to the term "possess," Black's Law Dictionary provides one definition: "To have in one's actual control."  Black's Law Dictionary (7th ed. 1999).  This comports with the term's employment in everyday language, and the Court will adopt this definition.

Having determined the meanings of "use" and "possess" under CITA, the Court next considers whether the provision requires that Plaintiff have "used" or "possessed" the entire Loan amount to render him ineligible for relief.  This scenario, where a third party takes out a loan in a another's name and secures only part of it before being stopped, leaving the remainder in the victim's account from which the victim then transfers at least some portion to another account, appears to present as a matter of first impression.  The statutory language does not provide an explicit answer, stating only that a victim may not "use or possess the credit, goods, services, money, or property obtained by the identity theft . . . ."  Cal. Civ. Code § 1798.92(d).  It is equally possible to read the statute to mean "use or possess in whole" or "use or possess in part or in whole" based on this phrasing.  Looking to the statutory scheme, the remainder of CITA's provisions

remain unhelpful. *See generally* Cal. Civ. Code §§ 1798.92–1798.97. The relevant terms appear only one additional time, in the law's provision that "[n]othing is this title shall be construed to affect a claimant's rights and remedies against a person who perpetrates identity theft or against any person who used or possessed the credit, goods, services, or property obtained by identity theft." Cal. Civ. Code § 1798.97(b). Reviewing the law's criminal code equivalent, California Penal Code § 530 *et seq.*, the Court finds no similar language on which to base its analysis. *See* Cal. Pen. Code §§ 530–530.8; *see also* Cal. S. Jud. Comm. B. Analysis, A.B. 655 (Aug. 21, 2001).

Thus, the Court turns to the statute's legislative history. *Hughes*, 952 P.2d at 649. During its original enactment, the California State Assembly's Judiciary Committee noted that it is "far reaching" and introduced "to improve notice and reporting requirements with regard to consumer credit reporting agencies and investigative consumer reporting agencies, and to provide a judicial procedure for victims of identity theft to protect themselves when pursued by creditors." Cal. Assemb. Jud. Comm. B. Analysis, A.B. 655 (May 8, 2001). The California State Senate Judiciary Committee concurred, noting that the purpose of the bill was to "[a]ttempt to increase consumer protections against identity theft by allowing consumers . . . to sue or cross-complain against creditors who continue to pursue them for debts after being notified that the debts were incurred as a result of identity theft." Cal. S. Jud. Comm. B. Analysis, A.B. 655 (Aug. 21, 2001). In a later letter entered into the Senate Record, bill author and then-assemblymember Roderick Wright noted that he "authored [the law] to provide California consumers with additional protections against identity theft." Cal. S. J., 2001-2002 Regular Sess. 259 (Aug. 28, 2002). The legislative history provides no other instructive points, except a note that the law "provide[s] for a specific civil action to protect victims of identity theft . . . [] who establishes by a preponderance of the evidence that he or she is a victim of identity theft as defined in Section 530.5 of the Penal Code." Cal. S. R. Comm. B. Analysis, A.B. 655., (Aug. 28, 2001); *see also* Cal. Assemb. Jud. Comm. B. Analysis, A.B. 655 (May 8, 2001).

Considering the evidence, the Court determines that CITA should be interpreted in a manner that serves to maximize protection for consumers who make colorable claims of identity theft.  Keeping with that intent, the Court determines that the California Supreme Court would most likely find that under these facts, where the property obtained by the identity theft is fungible and easily divisible—for example a cash loan—the victim is precluded from seeking relief only in relation to, and in the amount or proportion of, the goods or property over which they exercised "use or possession."

This interpretation avoids a scenario in which a victim is left responsible for, as an example, the entirety of a $10,000 fraudulent loan of which they remained only in control of merely $500 because the identity thief was able to carry off the rest before they were caught.  It also prevents a consumer from, for example, profiting to the tune of $9,500 from a fraudulent $10,000 loan when the identity thief manages to carry off only $500 before they are stopped.  This approach thus achieves the statutory aims by protecting the consumer from actual monetary loss, without overburdening creditors like Defendant NFCU.  Thus, the Court follows that approach.

Having resolved these matters, the Court now turns to the facts.  First, it is undisputed that Plaintiff transferred $1,300 of the Loan from his NFCU checking account to his NFCU savings account.  *See* DSS 8; Doc. No. 63-3 at 3; Garcia Depo. Tr. 108:5–16.  Moreover, it is undisputed that Defendant NFCU recovered $2,797.93 of the funds transferred to the Whitehead account and credited them to Plaintiff.  Consequently, there can be no genuine dispute that Plaintiff "controlled" or "possessed" these funds to an extent that precludes him from obtaining relief under CITA.  DSS No. 20.

Turning to the $4,000 Apple Cash transfer, Plaintiff testified that Apple investigated the transaction and sent him a check for $4,000.  Garcia Depo. Tr. 108:17–109:9; Plf. Decl. ¶ 14.  Thus, the Court finds that it is undisputed that Plaintiff "possessed" these funds as well, and cannot recover it.[13]

---

[13] As CITA allows consumers to seek relief from obligations fraudulently obtained in their name, this approach is in harmony with the Act's purpose:  if a consumer is reimbursed in the amount due by a

Turning to the remaining amount of the Loan, Defendant NFCU has not met its burden of demonstrating that it is undisputed Plaintiff used or possessed the $1,702.07 in principal that was transferred to and depleted from the Whitehead account. *See* DSS No. 9. The undisputed evidence reflects that the transfers to Whitehead's account were done from non-historical devices. DSS No. 8. Though they passed through Plaintiff's bank account briefly, whether he maintained any control of the funds at any time is unclear. Viewing the evidence in Plaintiff's favor, a jury could find that, as to this amount, Plaintiff did not use or possess it. Accordingly, the Court **DENIES** Defendant NFCU's motion on this basis.

### 2. Defendant NFCU as a Claimant

Defendant NFCU's also asserts that it is not a "claimant" under CITA because it has only sent Plaintiff "e-statements" showing the current account balance with no overdue amounts and has not, for example, "called Plaintiff to collect on the Loan, sent delinquency notices, or reported the Loan as delinquent." Doc. No. 64 at 16; *see, e.g.*, Doc. No. 68-10. A "claimant" under CITA is "a person who has or purports to have a claim for money or an interest in property in connection with a transaction procured through identity theft. The term is limited to someone who has a present interest in the 'claim for money or . . . property,' and 'not a person who had an interest in a disputed debt at some point in the past . . . .'" *Samia v. Experian Info. Sols., LLC*, No. 21-CV-1015 W (WVG), 2022 WL 298369 *4 (S.D. Cal. Feb. 1, 2022). As Plaintiff notes, the Ninth Circuit has rejected Defendant NFCU's position that it must be "actively attempting to collect" on its claim to be considered a claimant under CITA. *Kim v. BMW Fin. Servs. NA LLC*, 702 F. App'x 561, 563 (9th Cir. 2017) (citing *Satey*, 521 F.3d at 1093); *see also Martirosian v. JP Morgan Chase Bank, N.A.*, No. CV 13-2987 RGK (RZX), 2014 WL 12567792 *3 (C.D. Cal. Apr. 11, 2014) (holding that a creditor not actively pursuing a debt is a "claimant" unless it has "sold its interest or otherwise

third party, they can pay back the lender with the reimbursed funds and need not seek protection. *See generally* Cal. Civ. Code §1798.93.

divested itself of the right to collect"). Instead, "a claimant must simply have a claim at the time the lawsuit is filed." *Kim*, 702 F. App'x at 563. This district has, on other occasions, rejected similar arguments as well, holding that a "balance" reflected on an account is sufficient to infer that a bank "continu[es] to claim an interest in the money owed on the 'balance.'" *See Samia*, 2022 WL 298369 at *4. And here, Defendant NFCU does not genuinely dispute that it has a claim to some remaining portion of the Loan.[14] Based upon the record, there is sufficient evidence for a jury to determine Defendant NFCU is a claimant. For this reason, the Court **DENIES** Defendant NFCU's motion.

### 3. *Civil Penalties*

Finally, Defendant NFCU argues that Plaintiff cannot collect civil penalties under CITA because it diligently investigated Plaintiff's identity theft claim. Doc. No. 64 at 16–17. Plaintiff disagrees with Defendant NFCU's characterization of its investigation. Doc. No. 81 at 17. CITA allows for civil penalties upon clear and convincing evidence that

> (A) . . . at least 30 days prior to filing an action or within the cross-complaint pursuant to this section, [a victim of identity theft] provided written notice to the claimant at the address designated by the claimant for complaints related to credit reporting issues that a situation of identity theft might exist and explaining the basis for that belief; (B) . . . the claimant failed to diligently investigate the victim's notification of a possible identity theft; [and] (C) . . . the claimant continued to pursue its claim against the victim after the claimant was presented with facts that were later held to entitle the victim to a judgment pursuant to this section.

Cal. Civ. Code § 1798.93(c)(6).

Defendant NFCU points to its procedures for freezing suspicious transactions, training for fraud investigators, and Guardian fraud warning system as evidence that it adequately investigates claims. Doc. No. 64 at 16–17. It likewise notes that it did, in

---

[14] Indeed, in its motion's opening sentence, Defendant NFCU states "[t]his case is fundamentally about whether Plaintiff owes Navy Federal about $2,300—he does." Doc. No. 64 at 11.

fact, freeze accounts and funds in relation to the Loan.  *Id.*  Plaintiff disagrees, arguing that though they found the Loan was taken out fraudulently, Defendant NFCU representatives did not contact Plaintiff personally before denying his claim, relying instead upon the finding that a historical device made one transfer instead.  Doc. No. 81 at 17.  Plaintiff further argues that Defendant NFCU did not investigate Plaintiff's appeal in any meaningful way.  *Id.*

The record reveals several aspects of Defendant NFCU's actual investigation. Viewing the evidence in Plaintiff's favor, Holley, upon the initial review, did not call Plaintiff, and relied merely on the fact that her data demonstrated that a historical device made the Apple Cash transfer to deny his fraud claim.  Holley Depo. Tr. 54:2–59:10. This occurred despite a finding that the Loan was applied for using a "fraud cookie," and that the same "fraud cookie" made the transfers to the Whitehead account.  *Id.* at 62:4–62:25, 68:21–68:22.  In Holley's words "if fraud occurs on an account and the member states it's a scam or whatever the case may be, but evidence shows that their device also was a participant in any part of that, we can't determine how much they were involved or how much they  weren't involved.  We just have to go with what the evidence shows us at that particular time."  *Id.* at 37:15–37:21.  Additionally, both Holley and Senior Fraud Investigator Uzzle testified that Defendant NFCU does not track any money once it moves outside the NFCU accounts to verify or dismiss potential fraud claims.  *Id.* at 58:2–58:8; Uzzle Depo. Tr.  20:18–21:21.  Finally, despite the finding that a "fraud cookie" made the transfers to the Whitehead account, Defendant NFCU did not refund the full $4,500 that went to those accounts due to the separate Apple Cash transaction. Holley Depo Tr. at 91:6–91:16;  *see* Uzzle Depo. Tr.  34:1–49:25.[15]

---

[15] The Court notes that, in a now-withdrawn document that remains on the docket, Defendant NFCU provides written procedures for dealing with identity theft claims specifically.  Doc. No. 72-9.  This appears to be a longer version of a document already sealed.  *Compare id. with* Doc. No. 63-4. Regardless, this document would not change the outcome.  While it includes additional procedures and steps NFCU uses when dealing with an identity theft case, it largely omits discussion of the basis upon which investigators determine whether fraud occurred—which itself the Court reads to be contained in the properly sealed version.  *Id.*

As to Plaintiff's attempt to appeal this first investigation and determination, the actual steps taken are somewhat unclear. *See* Doc. No. 84-6 ("Paulson Depo. Tr.")[16] 31:9–37:6. However, Plaintiff provides evidence that the investigation on appeal did not account for the entire Loan, or the subsequent transfers and proceeds, but instead focused only on the $4,000 transfer from Plaintiff's account to Apple Cash in affirming the original denial. *Id.* 34:5–34:12; *see also* Doc. No. 67-8. Based upon all this evidence, a rational jury could find, by clear and convincing evidence, that Defendant NFCU failed to diligently investigate Plaintiff's report of identity theft pursuant to California Civil Code § 1798.93.[17] *See also, e.g.*, *Lara v. Experian Info. Sols., Inc.*, 625 F. Supp. 3d 1062, 1079 (S.D. Cal. 2022); *Cutler ex rel. Jay v. Sallie Mae, Inc.*, No. EDCV-13-2142-MWF, 2015 WL 1909482 *8 (C.D. Cal. Apr. 24, 2015). For this reason as well, the Court **DENIES** Defendant NFCU's motion for summary judgment.

## B.    California Consumer Credit Reporting Agencies Act/Fair Credit Reporting Act – Claims 2 & 7

Defendant NFCU next moves for summary judgment on Plaintiff's California Consumer Credit Reporting Agencies Act ("CCRAA") claims, asserting that the undisputed facts demonstrate that: (1) Defendant NFCU conducted a reasonable investigation into Plaintiff's claims; (2) Plaintiff suffered no cognizable harm; (3) Defendant NFCU's conduct was not willful if wrongful; and (4) Defendant NFCU's policies to comply with the CCRAA were reasonable, entitling it to safe harbor under California Civil Code § 1785.25(g). Doc. No. 64 at 17–22. Plaintiff rejects each of these arguments. Doc. No. 81 at 18–26.

Defendant NFCU also moves for summary judgment as to Plaintiff's claim under the Fair Credit Reporting Act ("FCRA"), arguing that: (1) Plaintiff does not have

---

[16] Doc. No. 84-6 contains the transcript of NFCU Assistant Vice President for Credit Bureau Furnishing and Disputes Lisa Paulson's deposition in this matter. The Court hereinafter references it by its transcript pagination and lineation.

[17] Defendant NFCU does not appear to move for summary judgment on the other elements required to obtain civil penalties.

standing; (2) Defendant NFCU conducted a reasonable investigation into Plaintiff's claims; and (3) Defendant NFCU's conduct was not willful.  Doc. No. 64 at 32–35.  Defendant's argument as to standing, however, is that Plaintiff is lacking because he was not harmed, essentially repeating its CCRAA harm argument.  As with the CCRAA claim, Plaintiff rejects each point.  Doc. No. 81 at 18–26.

Given the similarities between the two, courts presume that California courts would interpret CCRRA provisions consistent with the FCRA.  *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 889. (9th Cir. 2010);  *Olson v. Six Rivers Nat'l Bank*, 3 Cal. Rptr. 3d 301, 309 (Cal. Ct. App. 2003) ("Because the Credit Reporting Act is substantially based on the Federal Fair Credit Reporting Act . . . judicial interpretation of the federal provisions is persuasive authority and entitled to substantial weight when interpreting the California provisions.").  As Defendant NFCU's FCRA arguments and first three CCRAA arguments are coextensive, the Court will analyze them together.  As to Defendant NFCU's CCRAA "reasonable processes" argument, the Court will also address it here.

### 1.    *Plaintiff's Harm*

First, the Court assesses Defendant NFCU's argument that Plaintiff has not suffered harm.  Plaintiff argues that he presents evidence that he suffered emotional and reputational damages due to Defendant NFCU's credit reporting conduct.  Doc. No. 81 at 21–22.  Reputational damages and emotional distress are considered actual damages under the CCRAA and the FCRA.  *See Drew v. Equifax Info. Servs., LLC,* 690 F.3d 1100 (9th Cir. 2012) (FCRA); *Seungtae Kim v. BMW Fin. Servs. NA, LLC*, 142 F. Supp. 3d 935, 944 (C.D. Cal. 2015), *aff'd* sub nom. *Kim v. BMW Fin. Servs. NA LLC*, 702 F. App'x 561 (9th Cir. 2017) (under the FCRA, "[a]ctual damages may include damages for humiliation, mental distress, and injury to reputation and creditworthiness, even if the plaintiff has suffered no out-of-pocket losses"); *Grigoryan v. Experian Info. Sols., Inc.* 84 F. Supp. 3d 1044, 1086–90 (C.D. Cal. 2014); *Romero v. Monterey Fin. Servs., LLC*, No. 19CV1781 JM (KSC), 2021 WL 268635 *5 (S.D. Cal. Jan. 27, 2021).

Plaintiff presents evidence as to his emotional state after the Loan, disputes, and credit reporting saga. His father, for example, testified at deposition that "[n]ow my son after this, since that day that he got here, has been a son that can't sleep, that has trouble even communicating with most people, that I have noticed that his attitude towards life has changed a lot." Doc. No. 81-1 at 256–60[18] ("Garcia Sr. Depo. Tr.") 45:5–47:24. He further testifies that Plaintiff suffers from severe stomach pain and other pain that, according to doctors, possibly "had to do with stress" that he attributes to the interactions between Plaintiff and Defendant NFCU. *Id.* at 49:22–52:15. Plaintiff's mother declares that "every time he mentioned NFCU, Eddie would say that he was tired of what his life had become. " Perez Decl. ¶ 14.

At deposition, Plaintiff testified that he suffers from nightmares and panic attacks caused by the events, among other struggles. Garcia Depo. Tr. 84:5–90:16, 93:6–93:18. He states in his declaration that he "had to seek therapy to help with the stress from [NFCU] reporting this debt on my credit report and refusing to release me from my loan." Plf. Decl. ¶ 18. Plaintiff also includes medical records from on or around October 18, 2023, in which a provider notes:

> [Plaintiff] stated that last month his identity was stolen. "They took out a loan for $10,000.00 then deposited it into my account and pulled out the money." [Plaintiff] stated that the bank is refusing to make the situation right so he has had to get a lawyer "and since then I can't stop thinking, I am paranoid and on edge." [Plaintiff] stated that he is having racing thoughts, distracted, can't focus, sleep disturbance (trouble falling asleep and staying asleep-averages 6 hours of sleep a night and is tired), constant worrying, over thinking, restlessness, feelings of dread/doom "and I am always in panic mode." [Plaintiff] reported panic attacks that occur 2–3 times a week. He experiences shortness of breath, tightness []in his chest, racing heart, lightheadedness, tingling in body and sweatiness. [Plaintiff] reported depression . . . .

Doc. No. 80-5 at 3–4.

---

[18] The Court hereinafter references this deposition by its transcript pagination and lineation.

Based upon this evidence, a rational jury could find that, at minimum, Plaintiff suffered cognizable emotional damages due to Defendant NFCU's reporting the Loan to credit reporting agencies ("CRAs") and in the resulting investigations. For this reason, the Court **DENIES** Defendant NFCU's motion.

### 2.    *Defendant NFCU's Investigation*

The Court next turns to Defendant NFCU's argument that its investigation into Plaintiff's claims was reasonable. The CCRAA prohibits a person from furnishing "information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25. Under the FCRA, "[a] person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate." 15 U.S.C. § 1681s-2(a)(1)(A).

Analyzing both, courts have determined that upon receipt of a notice of dispute from a CRA, the entity that furnished the reported debt to the agency has an obligation to conduct a "reasonable investigation of what it learned about the nature of the dispute from the description in the CRA's notice of dispute." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (FCRA); 15 U.S.C. § 1681s-2(b)(1). A defendant violates this provision when it verifies "the accuracy of the information on the account attributed to Plaintiff without conducting a reasonable investigation." *Miller v. Westlake Servs. LLC*, 637 F. Supp. 3d 836, 855 (C.D. Cal. 2022). "Although the content of [an] automated credit dispute verification process ('ACDV') sets forth the nature of the dispute, the ACDV does not 'cabin [ ] the scope of the investigation once undertaken.'" *Seungtae Kim*, 142 F. Supp. 3d at 948 (quoting *Gorman*, 584 F.3d at 1157 n.11). In general, questions of reasonableness are matters for the jury who, as laypersons, have "unique competence in applying the 'reasonable man' standard." *Gorman*, 584 F.3d at 1157 (citing *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994)). Therefore, summary judgment is appropriate only if there is but one possible conclusion

as to the investigation's reasonableness.  *Id.*

Defendant NFCU asserts that its initial investigation into the Loan was reasonable, and therefore later credit reporting investigations that relied on it were reasonable too. *See* Doc. No. 64 at 18–19.  Defendant also provides testimony that, in "account takeover" scenarios—where a third-party gains access to a member's account through fraud— dispute specialists can review records and refer the dispute to the security department for identity theft review in cases of discrepancy.  Paulson Depo. Tr. at 18:3–18:22.

First, for the same reasons the Court finds a rational jury could find that Defendant NFCU failed to diligently investigate Plaintiff's report of identity theft, a jury could find that, under the CCRAA and FDCA, Defendant NFCU's first investigation by its security team was not reasonable.  In short, Plaintiff provides sufficient evidence to allow the jury to find that Holley relied solely on the fact that her data demonstrated that a historical device made the Apple Cash transfer to deny his fraud claim, despite finding that the Loan was applied for using a "fraud cookie," and that the same "fraud cookie" made the transfers to the Whitehead account.  Holley Depo. Tr. at 54:2 –59:10, 62:10–62:25, 68:21–68:22.  Plaintiff also puts forth evidence that Defendant NFCU does not track any money once it moves outside the NFCU accounts to verify or dismiss potential fraud claims, instead relying only on its limited internal records.  *Id.* at 58:2–58:8; Uzzle Depo. Tr. at 20:18–21:21.

Second, Plaintiff submits evidence that, upon receiving a "block notification"[19] from TransUnion regarding the Loan and possible fraud, Defendant NFCU's assigned representative, Cornelia Wielgus, did not call Plaintiff to inquire as to the $4,000 moved to Apple Cash, nor review his Declaration of Fraud/Forgery in assessing the original investigation.  Doc. No. 84-5 ("Wielgus Depo. Tr.") at 62:6–63:7.  Wielgus testified that she did not review the internal online activity tracking system used in the initial

---

[19] A "block notification" is "a credit reporting agency notifying a creditor because they have blocked reporting because of a claim of identity theft that they have received from a consumer."  Doc. No. 84-6 ("Paulson Depo. Tr.") 57:14–57:19.

determination, did not speak to police officers, and did not speak to the previous investigator on the case. *Id.* at 66:17–67:7. Indeed, Wielgus stated that she relied on the same basis as Holley to determine Plaintiff "participated" in the activity surrounding the loan: the $4,000 transfer and $1,300 transfer, despite having never investigated into whose Apple account the $4,000 was transferred and seeing no evidence that Plaintiff himself received the $4,000 transfer. *Id.* at 74:5–75:23. An additional credit bureau dispute team member that handled a block notice, Vendol Black, testified that in "reinsertion" procedures,[20] the responsible NFCU representative merely reviews the notes of the initial security team investigation to determine if investigation found fraud, and uses that finding to determine the matter. Doc. No 84-1 ("Black Depo. Tr.") at 13:1–14:15, 46:6–46:12, 52:7–53:13, 60:2–60:10; Doc. No. 81-1 at 21; Doc. No. 81-1 at 71.

Plaintiff likewise submits evidence as to Lauren Gallahan's and Stephanie Lowry's actions, NFCU employees who dealt with the other two disputes sent to Defendant NFCU from Experian and Equifax. A jury could find that Ms. Gallahan, for example, relied on the initial security investigation's findings to submit the dispute responses, that her review of other internal items is only for the purposes of determining whether they are consistent with one another, and that she does not review the contents of those investigations to determine whether they are accurate. Doc. No. 84-2 ("Gallahan Depo. Tr.") at 57:9 –62:21. Plaintiff also includes testimony that could support a finding that she would not look at internal documents if those documents are archived because "that takes 24 hours to pull up." *Id.* at 64:17–65:5, 76:21–77:6. From Lowry, a jury could determine that her review involved simply matching the relevant consumer demographic information and submitting a response that automatically adopted the security investigation's finding regardless of information on other documents within a consumer's

---

[20] A "reinsertion is where a member has claimed identity theft, security does their investigation . . . sends it to the credit bureau dispute team, and [that team] reinsert[s] the credit report if its denied ID theft." Doc. No. 84-1 at 13:01–13:06. This occurs after a credit agency has issued a block notice. *See id.* 55:8–66:25.

file.  Doc. No. 81-1 at 154–169[21] ("Lowry Depo. Tr.") at 18:21–20:9, 23:3–25:17, 31:12–32:2.  Finally, Plaintiff provides evidence and argument that the volume and speed of Defendant NFCU's dispute resolution process could lead a jury to infer that a reasonable investigation could not happen under the circumstances.  This includes evidence, for example, that in January 2024 Gallahan resolved 697 disputes over 96 hours (7.26 disputes per hour), Lowry resolved 724 disputes over 156.28 hours (4.63 disputes per hour), and Black resolved 2975 disputes over 191 hours (15.58 disputes per hour).  Doc. No. 81-1 at 58–60.

Viewing this evidence in the light most favorable to the nonmovant, a jury could find that Defendant NFCU did not conduct a reasonable investigation of Plaintiff's disputes and instead merely "rubber stamped" its earlier investigation, regardless of whether that investigation came to accurate or reasonable conclusions—and that, under these facts, this process was unreasonable.  *Cf. Gorman*, 584 F.3d at 1156 ("A provision that required only a cursory investigation would not provide such protection; instead, it would allow furnishers to escape their obligations by merely rubber stamping their earlier submissions . . . .");  *Miller*, 637 F. Supp. 3d at 848 (same).  Though the parties disagree as to exactly what information was transmitted to Defendant NFCU through the CRAs' notification process here, the Court finds that, even under Defendants' versions, the jury could find the investigation unreasonable.  *See* Doc. No. 68-8.

Defendant NFCU also argues, briefly, that because Plaintiff accepted its online banking terms and conditions, he accepted responsibility for everything that followed.  Doc. No. 64 at 19.[22]  Though the NFCU terms and conditions do state that the user takes

---

[21] The Court references this document hereinafter its transcript pagination and lineation.

[22] To the extent Defendant NFCU also argues that its investigation was reasonable because Plaintiff "benefitted" from the transaction under the Electronic Funds Transfer Act, the Court disagrees.  Doc. No. 64 at 19.  First, the Court agrees with the *New York by James* court, that the mere deposit of money into Plaintiff's account should not be considered to his "benefit" unless he receives some additional downstream benefit such as making purchases, reducing an existing debt, etc.  *New York by James* 2025 WL 251302 at *16–18.  Defendant NFCU does not provide evidence that Plaintiff "benefitted" from the Loan, and it is disputed as to whether Plaintiff could have benefitted, as he was left an outstanding

responsibility for "safeguarding and protecting [their] Password, Reset Question and Answer, Challenge Questions and Answers, or any other credentials used to access Mobile or Online Banking[]" and the actions taken by "anyone to whom you have provided your credentials," *see* Doc. No. 68-1 at 11, this does not render summary judgment proper. "Whether a [California] statutory provision can be waived by contract depends on the specific statute and the circumstances of each case. When the statutory language is plain and 'brooks no interpretation' other than that a specific act is prohibited or required, allowing a contractual waiver "would [flout] the very purpose of the rule," even if the waiver were given in exchange for other concessions." *Doskocz v. Ass'n Lien Servs.*, No. 15-CV-01525-JD, 2016 WL 7425922 *4 (N.D. Cal. Dec. 23, 2016) (quoting *DeBerard Properties, Ltd. v. Lim,* 976 P.2d 843, 845 (Cal. 1999)). The Legislature's use of the word "shall" in mandating an entity's duties is a strong indication that the duty is nonwaivable. *Id.*; *see* Cal. Civ. Code § 1785.25(a) ("A person shall not furnish information . . . .").

As far as this argument can be construed as applicable to the FCRA claims, "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945).

> Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate. With respect to private rights [created[ by a federal statute . . . the question of whether the statutory right may be waived depends upon the intention of Congress as manifested in the particular statute.

*Id.* at 704–05.

---

balance substantially larger than any money Whitehead left behind and maintains that he used any remaining funds to pay back the loans.

Defendant NFCU points to no indication that Congress intended to make the rights contained in the FCRA waivable, nor can the Court identify one. *See, e.g.*, *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 46 (2024) ("In the Consumer Credit Reporting Reform Act of 1996 [creating the private right of action against parties like Defendant NFCU], Congress amended the FCRA to broaden its reach."); *see generally* H.R. Rep. 104-863 (1996) (Conf. Rep.).[23]

Likewise, a party asserting waiver must identify evidence of the waiving party's intent to waive a known right in agreeing to the contract or terms. *See Gordonsville Energy, L.P. v. Virginia Elec. & Power Co.*, 512 S.E.2d 811, 818 (Va. 1999); *Quach v. California Com. Club, Inc.,* 551 P.3d 1123, 1138–39 (Cal. 2024) (citing *Altman v. McCollum*, 236 P.2d 914, 922 (Cal. Super. Ct. App. Dep't 1951)).[24]  Defendant NFCU's terms do not contain an explicit statement that the signatory is waiving their statutory rights under credit reporting statutes. *See generally* Doc. No. 68-1.  For all of these reasons, the Court **DENIES** Defendant NFCU's motion on this basis.

### 3.    *Willfulness*

Defendant also argues that its conduct, if wrongful, was not willful.  Willful violations, under both the FCRA and CCRAA, enable statutory and/or punitive damages. *Grigoryan*, 84 F. Supp. at 1091; *see also Gorman*, 584 F.3d at 1169–73; *Carvalho, LLC*, 629 F.3d at 888–89.  Under the FCRA, "[t]o prove a willful violation, a plaintiff must show not only that the defendant's interpretation was objectively unreasonable, but also that the defendant ran a risk of violating the statute that was substantially greater than the

---

[23] The Court also notes that, though its impact on statutory interpretation here is *de minimis*, the FTC issued an advisory opinion that includes the same conclusion.  Advisory Opinion to Hauxwell, F.T.C. (Jun. 12, 1998), https://www.ftc.gov/legal-library/browse/advisory-opinions/advisory-opinion-hauxwell-06-12-98#:~:text=We%20note%20that%20no%20authorization%20for%20a,to%20waive%20their%20rights%20under%20the%20law. (last accessed March 11, 2025) [https://perma.cc/N8JZ-NJBM].

[24] Being that this argument was merely touched on in briefing, neither party addresses what contract law would apply to determine whether Plaintiff waived any rights.  Based upon the terms and conditions and the jurisdiction in which Plaintiff lives and the case was brought, the Court presumes that either Virginia or California law applies.  *See* Doc. No. 68-1 at 13.  As both utilize functionally identical standards, the result is the same under either.

risk associated with a reading that was merely careless." *Marino v. Ocwen Loan Servicing LLC*, 978 F.3d 669, 673 (9th Cir. 2020) (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69, (2007)). "That is, the defendant must have taken action involving 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1101 (N.D. Cal. 2016) (quoting *Bateman v. Am. Multi-Cinema*, 623 F.3d 708, 711 n.1 (9th Cir. 2010)). "The statutory requirement of willfulness does not require proof of an intent to cause harm, but only an intent to fail to comply with the FCRA." *Id.* at 1110 (quoting *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007)). As with questions of reasonableness, "[w]illfulness under the FCRA is generally a question of fact for the jury." *Id.* (collecting cases) (internal quotation marks omitted)).

Under California law, "three essential elements must be present to raise a negligent act to the level of willful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril." *Manuel v. Pac. Gas & Elec. Co.*, 93 Cal. Rptr. 3d 9, 21–22 (Cal. Ct. App. 2009); *Grigorian*, 84 F. Supp. 3d at 1091 (quoting *New v. Consol. Rock Products, Co.*, 217 Cal. Rptr. 522, 526 (Cal. Ct. App. 1985)). Comparing the FCRA and CCRAA, courts have found these standards effectively the same. *See, e.g.*, *Grigorian*, 84 F. Supp. 3d at 1091; *Banga v. First USA, NA*, 29 F. Supp. 3d 1270, 1279 (N.D. Cal. 2014).

Plaintiff points to NFCU's dispute resolution volume, timeframes, and substantive investigation steps to support its arguments that Defendant NFCU's conduct was willful. Doc. No. 81 at 22–25. These arguments are, in effect, the same he makes for reasonableness. Taken in the light most favorable to Plaintiff, the Court finds that, for the same reasons a jury could find the investigation was unreasonable, it could also find that the unreasonable investigation, and the resulting inaccuracy, were willful. Accordingly, the Court **DENIES** NFCU's motion for summary judgment on this basis as well.

### 4.    *CCRAA – Reasonable Processes*

Finally, Defendant NFCU asserts that "[e]ven if Plaintiff proves each element of his CCRAA claim, he cannot prevail because Navy Federal maintained reasonable procedures to comply with the statute." Doc. No. 64 at 20. California Civil Code § 1785.25(g) provides that "[a] person who furnishes information to a consumer credit reporting agency is liable for failure to comply with this section, unless the furnisher establishes by a preponderance of the evidence that, at the time of the failure to comply with this section, the furnisher maintained reasonable procedures to comply with those provisions." Cal. Civ. Code § 1785.25(g). As with the other questions of reasonableness addressed throughout, whether Defendant NFCU's policies are "reasonable" is a question of fact generally more appropriate for a jury. *See, e.g.*, *Keil v. Equifax Info. Servs.*, No. C 13-03989 SI, 2014 WL 4477610 *2 (N.D. Cal. Sept. 10, 2014) (denying the plaintiff's motion for summary judgment).

Defendant NFCU seeks to establish its policies were reasonable through several avenues. First, the parties do not dispute that Defendant NFCU

> conducted robust training for Bureau Dispute Specialists handling consumer credit bureau disputes, with special training for identity theft disputes and direct oversight from a mentor. Only once a trainee was comfortable with a particular type of dispute could they proceed to learning another type of dispute. This process entailed two-to-three months of training, mentoring, and review for each new type of dispute.

DSS No. 27; Paulson Decl. ¶ 17.

Second, Defendant NFCU presents written procedures that it asserts it provides to credit bureau dispute specialists that supplement its training. Doc. No. 68-9. That document provides steps to reviewing an ID theft claim in credit reporting disputes. *Id.* It instructs specialists as to what documents they are to review (e.g., original or copy of signed application; original or copy of the signed contract (promissory note); copy of consumer identification submitted by consumer at time of application; communication

to/from the member or a representative of the member indicating that the member received loan proceeds, or collateral), and "red flags"—warnings—for potential identity theft (e.g., "[e]lderly [m]ember (Over age 80) with no sponsor or accounts are in overdrawn status, charged-off, multiple denied applications"; "discrepancies in employment and income on lending applications submitted within 30-days of each other"). *Id.* at 3–7. It also provides outlines for disputes submitted in letter form, including instructions that: "[i]f [a] previous claim was denied [by security], confirm that the letter refers to the same account and then validate the trade line(s) and send the appropriate response. *Id.* at 8.

Defendant NFCU also submits written procedures for fraud investigators. Doc. No. 63-4. This lists red flags for reasons a claim could be denied, including, for example "[c]omparison of the contactless payment device (cell phone, Apple watch, etc.) on the reported fraudulent activity matches the device used for valid purchases and the device was not out of the member's possession"; "[d]uring the investigation, reviewing the member's statement history reveals the reported fraudulent activity matches that of non-fraudulent activity on the card." *Id.* at 5. However, the document notes that "[t]hese circumstances cannot be solely relied upon on without a complete investigation or assessment of the circumstances, as required by Regulation E . . . All claim decisions must be based on all available facts and circumstances." *Id.* The written procedures also note reasons that claims cannot be denied, including: "[a] PIN is written on the card or kept with the card"; "[a] claim cannot be denied just because a family member stole the card. It is the [i]nvestigator's responsibility to determine if the member benefited from the transactions"; and "[t]he member did not submit a written claim." *Id.* at 6.

Plaintiff maintains that Defendant NFCU's policies are unreasonable because, in reality, they merely "rubber stamp" the original findings of an investigation, regardless of its accuracy. Doc. No. 81 at 25. Plaintiff points to testimony, discussed above, which he maintains shows that, independent of any written policy, dispute specialists do not look at the underlying documents if the security team has already made a fraud determination,

but merely adopt the security team's result as a matter of course. *See, e.g.*, Lowry Depo. Tr. 18:21–19:20; Gallahan Depo. Tr. 57:9 –62:21. Viewing this evidence in the light most favorable to the nonmovant here, a reasonable jury could find that Defendant NFCU's policies, as written and/or in practice, are not reasonable means of complying with the CCRAA.

For all of these reasons, the Court **DENIES** Defendant NFCU's motion for summary judgment as to Plaintiff's CCRAA and FCRA claims (Claims 2 & 7).

## D.    Rosenthal Fair Debt Collections Act – Claim 3

Defendant NFCU moves for summary judgment on Plaintiff's claims under California Civil Code section 1788.2, the Rosenthal Fair Debt Collections Act ("RFDCA"), arguing that it is not a "debt collector" under the law. Doc. No. 64 at 22–24. Plaintiff does not address these arguments.

"To prevail on a claim under the Rosenthal Act, a plaintiff must show that (1) the plaintiff is a debtor, (2) the debt at issue is a consumer debt, (3) the defendant is a debt collector, and (4) that the defendant violated one of the liability provisions of the Rosenthal Act." *Brown v. EdFinancial Servs., LLC*, No. 5:23-CV-01273-WLH-DTB, 2024 WL 3550479 *2 (C.D. Cal. Jul. 9, 2024) (quoting *Long v. Nationwide Legal File & Serve, Inc.*, 2013 WL 5219053, *17 (N.D. Cal. Sept. 17, 2013)). The law defines "debt" to mean "money, property, or their equivalent that is due or owing or alleged to be due or owing from a natural person to another person[,]" and "debt collector" to mean "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." Cal. Civ. Code § 1788.2(b)–(c).

Under the California Attorney General's official guidance and the interpretation followed by other district courts, a debt is "due and owing" if it has become delinquent and subject to collection. *Brown*, 2024 WL 3550479 at *2 (citing 85 Cal. Op. Att'y Gen. 215, 2002 WL 31440180 *3). Debts that are "current" are not subject to the RFDCA. *Id.* There is no dispute that the Loan as stands is not due until July 2025, and that Navy federal reports it as "current" to CRAs. DSS 29, 31. Thus, the Loan is not a

"debt" under the RFDCA.  The Court therefore **GRANTS** Defendant NFCU's motion for summary judgment as to Plaintiff's RFDCA claim (Claim 3).

### E.  Electronic Funds Transfer Act – Claim 4

Defendant NFCU next moves for summary judgment on Plaintiff's Electronic Funds Transfer Act ("EFTA") claims on the basis that: (1) the electronic transfers made by individuals other than Plaintiff were not "errors" or "unauthorized"; (2) the EFTA does not cover the transfers that Plaintiff himself initiated; (3) Defendant NFCU conducted a reasonable investigation into any alleged error; and (4) Defendant NFCU maintains procedures reasonably adapted to avoid error.  Doc. No. 64 at 24–30.  Plaintiff argues, in turn, that: (1) Defendant NFCU has not met its burden to prove the transfers by others were authorized; (2) Defendant NFCU's investigation was not reasonable; and (3) Defendant NFCU did not prove its "*bona fide* error" affirmative defense.  Doc. No. 81 at 26–31.

15 U.S.C. § 1693f requires that, after receiving notice from the consumer of an alleged error, a "financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days[]" and take certain remedial steps should it determine error occurred.  *See* 15 U.S.C. § 1693f(a)–(c).  For the purposes of that section, an "error" is:

> (1) an unauthorized electronic fund transfer; (2) an incorrect electronic fund transfer from or to the consumer's account; (3) the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included; (4) a computational error by the financial institution; (5) the consumer's receipt of an incorrect amount of money from an electronic terminal; (6) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this subchapter; or (7) [other errors described in regulations] . . . .

*Id.* at § 1693f(f).

Subsection 1693f(d) requires that:

if the financial institution determines after its investigation pursuant to subsection (a) or (c) that an error did not occur, it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur. The financial institution shall include notice of the right to request reproductions with the explanation of its findings.

*Id.* at § 1693f(d).

As a threshold matter, Plaintiff appears correct in his conclusion that that Defendant does not move for summary judgment on his claim to the extent he asserts Defendant NFCU violated subsection (d). Doc. No. 81 at 26. Defendant NFCU presents no facts or argument as to that claim, nor does it not challenge Plaintiff's conclusion as to its failure to move in its reply. *See* Doc. No. 82 at 9–11. Thus, to the extent Defendant NFCU seeks summary judgment on Plaintiff's claim, to the extent it is based upon a subsection (d) violation, the Court **DENIES** its motion.

### 1. *Plaintiff's Authorization/Initiation*

Defendant NFCU does, however, move for summary judgment on Plaintiff's claim under 15 U.S.C. § 1693f(a)–(c). Defendant NFCU is correct that the EFTA excludes from its definition of "unauthorized electronic fund transfer" any transfer made by from the consumer's account by the consumer. 15 U.S.C. § 1693a(12). *See* Doc. No. 81 at 26–31. Thus, the Court **GRANTS** summary judgment for Defendant NFCU as to the $1,300 transfer that the parties do not dispute Plaintiff made from his checking to savings account.

Defendant NFCU next argues that, under the statute's plain meaning and using the Court's "independent judgment" per *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ("*Loper Bright*"), Plaintiff's having given the fraudulent user his information at all constitutes his furnishing them with information, and thus the transfer was not

"unauthorized."  Doc. No. 64 at 24–25 (quoting 15 U.S.C. § 1693a(12)(A)).  As contrary regulatory language developed pre-*Loper Bright*, Defendant argues that the Court should pay it only limited mind.  *Id.* at 25.  Defendant NFCU cites two cases, one from the Southern District of California and one from the Second Circuit, in support of its argument.

Plaintiff argues that the means of access to his account were obtained through fraud, and he therefore never truly "furnished" the fraudulent user with his information, pointing to interpreting regulations by the Federal Reserve Board and Consumer Financial Protection Bureau ("CFPB").  Doc. No. 81 at 27.  Both support interpretations that "[a]n unauthorized [transfer] includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery."  12 C.F.R. § 205, Supp. I at 2(m)(3) (Fed. Reserve Bd.); 12 C.F.R. § 1005, Supp. I at 2(m)(3) (CFPB) (same).  Plaintiff also points to a case from the Southern District of New York, citing both regulations and holding that account information furnished under fraudulent pretenses is not "authorized" under the EFTA.  *Green v. Cap. One, N.A.*, 557 F. Supp. 3d 441, 447–48 (S.D.N.Y. 2021).

Having reviewed the law and considered the parties' arguments, the Court agrees with Plaintiff's reading.  First, the idea that one can, through fraudulent inducement, "furnish" account information sufficient to fall under Section 1693a(12)(A) runs contrary to the rest of that provision, which exempts transfers initiated by one who has furnished said information, but the "consumer has [since] notified the financial institution involved that transfers by such other person are no longer authorized."  15 U.S.C. § 1693a(12)(A).  This provision presumes a consumer's knowledge that the "authorized" user was intended or empowered to make transactions and, as the *Green* court notes, "it would be illogical to require a consumer to revoke the account access of an individual who was never intended to have such access in the first place, or else risk liability for any resulting unintended transfers."  *Green*, 557 F. Supp. 3d at 448.

Second, the definition Defendant NFCU advances risks creating an absurd result,

which "are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). By taking the term "furnished" to mean provided by a consumer regardless of knowledge or intent the Court risks outcomes where, for example, a transaction made possible when a consumer's information is gained through outside hacking or pickpocketing is "unauthorized," but one made when that information is handed over by virtue of trickery or gunpoint robbery is not. This seems to subvert the EFTA's protections through hyper-literal interpretation and does not fit with the remaining carveouts to "unauthorized transfers" set forth in Section 1693a(12): transactions initiated with fraudulent intent by the consumer or a person acting in concert with them, and errors by a financial institution. 15 U.S.C. § 1693a(12)(B)–(C).

The Court also looks to Congress' intent in passing the statute. The congressional findings and statement of purpose state that the EFTA's "primary objective . . . is the provision of individual consumer rights." 16 U.S.C. 1693(b). Plaintiff's reading provides the greatest protection to consumers and thus most effectively serves that purpose.

As to agency interpretations, *Loper Bright*, while striking down the doctrine known as *Chevron* regulatory deference and instructing the federal courts to exercise "independent judgment" to resolve statutory ambiguities, does not instruct the Court to relegate all agency regulations or interpretations to the legal anti-canon nor presume their incorrectness by virtue of their existence. 603 U.S. at 398–99, 402. Instead, it permits the Court to consider, alongside its other methods of statutory interpretation, "the agency's 'body of experience and informed judgment[.]'" *Id.* at 402 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade. . . ." *Skidmore*, 323 U.S. at 140; *see also Loper Bright*, 603 U.S. at 476 (Kagan, J. dissenting) ("[T]he majority makes clear that . . . *Skidmore*

deference continues to apply.").  As Defendant NFCU points out in passing, Doc. No. 64 at 25, official agency interpretations that do not undergo notice-and-comment processes were never subject to *Chevron* deference anyway, but instead were always assessed pursuant to *Skidmore*.  *See Sundby v. Marquee Funding Grp., Inc.*, No. 19-CV-00390-GPC-MDD, 2019 WL 3945445 *11 (S.D. Cal. Aug. 21, 2019) (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 586–87 (2000) in discussing CFPB official interpretation processes).  Thus, while not deferring to their interpretation, the Court recognizes that two executive agencies specializing in consumer finance areas have both issued official interpretations stating that obtaining account access from the consumer through fraud or robbery does not constitute an "authorized transfer."

Additionally, the Court notes that *Green* and other district courts have looked favorably on Plaintiff's interpretation under similar facts.  *See Green*, 557 F. Supp. 3d at 447–48; *Georgion v. Bank of Am., N.A.*, No. 3:22-CV-00618-RJC-WCM, 2024 WL 3844960 *5 (W.D.N.C. Mar. 20, 2024); *cf. Sanchez v. Navy Fed. Credit Union*, No. EDCV23285JGBKKX, 2023 WL 6370235 *23 (C.D. Cal. Aug. 14, 2023) (differentiating from *Green* because the plaintiff had "accessed her own account and initiated the transfers herself.").

Finally, the cases Defendant NFCU relies on do not support its proposed interpretation.  Unlike in *In re Bank of America California Unemployment Benefits Litigation*, Plaintiff identifies a "qualifying error," putting forth evidence of unauthorized transfers, sufficient to trigger the EFTA.  674 F. Supp. 3d 884, 908–910 (S.D. Cal. 2023).  As to *Aikens v. Portfolio Recovery Assc., Inc.*, there the plaintiff in that case furnished her information to her bank orally for the purpose of making withdraws, and never requested that it stop withdrawing money.  716 F. App'x 37, 39, 40 (2d Cir. 2017).  As there was no question of fraud and thus whether the transfers were unauthorized, the case is inapposite.  *See Green*, 557 F. Supp. 3d at 449 (discussing *Aikens*).

For these reasons, the Court finds that a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery is not exempted from the

definition of an "unauthorized electronic fund transfer" under Section 1693a(12) by Section 1693a(12)(A).  Accordingly, the Court **DENIES** NFCU's motion for summary judgment on this basis.

### 2.    *Reasonable Investigation*

Defendant NFCU next argues that summary judgment on Plaintiff's EFTA claims is appropriate because it conducted a good faith investigation of the alleged error, had a reasonable basis for believing the account was not in error, and did not "knowingly and willfully conclude[] that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available . . . at the time of [the] investigation."  Doc. No. 64 at 28 (citing 15 U.S.C. § 1693f(e)).  Plaintiff argues in response that Defendant NFCU misstates the requirements for reasonableness under the EFTA, and that its investigation was unreasonable even under the standard it uses.  Doc. No. 81 at 28–29.

As Plaintiff correctly argues, the standard Defendant NFCU cites is the proof required for treble damages under the EFTA, not the standard for reasonableness.  *See* 15 U.S.C. § 1693f(e)(2).  Limited guidance exists as to the precise meaning of "reasonableness" under the statute but again, "summary judgment is appropriate 'when only one conclusion about the conduct's reasonableness is possible.'"  *Nguyen v. Wescom Cent. Credit Union*, No. SACV 22-01520-CJC (JDEX), 2023 WL 9019022 *3 (C.D. Cal. Nov. 15, 2023).  The parties agree, Doc. No. 64 at 28; Doc. No. 81 at 29, that at minimum a "reasonable investigation" must include a reasonable review of the institution's own records.  *Id.* at *4; *In re Bank of Am. California Unemployment Benefits Litig.*, 674 F. Supp. 3d at 912 (citing *Green*, 557 F. Supp. at 450–51).

Here, Plaintiff cites evidence that though Holley determined that the $4,500 in transfers to Whitehead were done by "fraud cookie," she ignored that evidence in concluding that he was not entitled to a refund.  Doc. No. 63-3; Holley Depo. Tr. 36:1–36:4, 59:11–60:11; Doc. No. 67-5.  Plaintiff also provides evidence that could allow a jury to find that, regardless of what evidence she reviewed, Holley's determination was

based purely on whether any of the transfers were marked as made by a "historic device"—a conclusion as to one transfer that determined the outcome for the rest. *See* Holley Depo. Tr. 36:1–37:21. Likewise, a jury could find that upon Plaintiff's attempt to appeal Defendant NFCU's initial decision regarding the Loan and subsequent transfers, NFCU reviewed only the $4,000 Apple Cash transfer, and not the $4,500 in transfers to Whitehead. *See* Doc. No. 67-8; *see also* Paulson Depo. Tr. 32:5–34:12. A jury could determine that: (1) Defendant NFCU's initial investigation relied only on use of a historical device in one transfer and the appeal focused only on the $4,000 transfer; and (2) that such exclusive reliance and focus was not reasonable "because additional information within its own records pertaining to the particular account in question could help to resolve [Plaintiff's] claim'" and was not given any true weight. *Nguyen*, 2023 WL 9019022 *4. Viewing the facts in Plaintiff's favor, a jury could find that Defendant NFCU's investigation was not reasonable. The Court therefore **DENIES** Defendant NFCU's motion on this basis.

### 3.    *Procedures Adapted to Avoid Error/*"**Bona Fide** *Error*" **Defense**

Finally, Defendant NFCU argues that Plaintiff's EFTA claim fails because a preponderance of the evidence shows that any violation: (1) was not intentional; (2) resulted from a *bona fide* error; and (3) occurred notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Doc. No. 64 at 29–30 (citing 15 U.S.C. § 1693m(c)). An affirmative defense, the burden of proof here is on Defendant NFCU. 15 U.S.C. § 1693m(c).

"Where the moving party has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim or defense." *Chiron Corp. v. Abbott Lab'ys*, 902 F. Supp. 1103, 1110 (N.D. Cal. 1995); *Morgan v. United States Soccer Fed'n, Inc.*, 445 F. Supp. 3d 635, 651 (C.D. Cal. 2020); *see Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, No. 08-CV-2307 H (POR), 2009 WL 10671324 *2 (S.D. Cal. Apr. 27, 2009). Under the affirmative defense cited, a defendant must prove that an alleged error: (1) was not

intentional; (2) resulted from a bona fide error; and (3) occurred notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. *See* 15 U.S.C. § 1693m(c); *In re Cardtronics ATM Fee Notice Litig.*, 874 F. Supp. 2d 916, 922 (S.D. Cal. 2012), *aff'd*, 559 F. App'x 633 (9th Cir. 2014); *Simone v. M & M Fitness LLC*, No. CV-16-01229-PHX-JJT, 2017 WL 1318012 at *5 (D. Ariz. Apr. 10, 2017). Here, Defendant NFCU presents argument and identifies facts only as to the third element. Doc. No. 64 at 30. It does not point to evidence that any error occurred unintentionally, or that it was the result of a *bona fide* mistake of fact rather than of law.[25] *See Simone* 2017 WL 1318012 at *5 (holding a *bona fide* error is a mistake of fact, not law) (citing *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA*, 559 U.S. 573 (2010) and collecting cases). As Defendant NFCU does not carry its burden on this affirmative defense to present facts that establish elements of its case, the Court cannot grant it summary judgment on this claim.

Moreover, a jury could conclude that Defendant NFCU's procedures were not reasonably adapted to avoid the errors that Plaintiff claimed he experienced. A "reasonably adapted" procedure can include a combination of written policies and trainings designed to prevent the type of error alleged in a given case. *See Newman v. JP Morgan Chase Bank, N.A.*, No. 22-CV-6948 (JMF), 2024 WL 3227094 (S.D.N.Y. June 27, 2024) (collecting cases). Procedures need not be "foolproof," but must constitute "reasonable precautions" against error. *In re Cardtronics ATM Fee Notice Litig.*, 874 F. Supp. 2d at 922–23 (quoting, parenthetically, *Puglisi v. Debt Recovery Solutions, LLC*, 822 F.Supp.2d 218, 226–27 (E.D.N.Y. 2011)). "Maintenance" of policies means that "the proper procedures were followed time in and time out." *Id.* at 925 (internal quotation omitted). The Court applies the same caution as to resolving issues of "reasonableness" at summary judgment on this issue as it does to those discussed above.

---

[25] Indeed, Defendant NFCU's argument as to whether the transactions were "authorized" by Plaintiff implies that any error may have been due to a misunderstanding of law, not fact.

NFCU relies on its written procedures for fraud investigators discussed above. Doc. No. 64 at 29–30; Doc. No. 63-4.  Plaintiff, conversely, focuses on testimony that the actual practice in place—the effective policy—requires determinations as to fraudulent transfers and liability purely on the basis of whether any related transfer was made by a "historic device," not whether the contested transfer itself was, and to leave the investigation at that.  *See, e.g.*, Holley Depo. Tr. 36:1–37:21.  Defendant NFCU identifies no additional evidence to demonstrate regular compliance with its written policies.  For the same reasons discussed above, a jury could find that Plaintiff's portrayal of Defendant NFCU's policies is accurate and that they were not reasonably adapted to avoid the errors Plaintiff maintains he experienced.

Therefore, the Court **DENIES** Defendant NFCU's motion for summary judgment as to Plaintiff's EFTA claim (Claim 4).

## F.   Fair Credit Billing Act – Claim 5

Defendant NFCU moves for summary judgment on Plaintiff's claim under the Fair Credit Billing Act, 15 U.S. Code §§ 1666 *et seq*. ("FCBA") "because the FCBA does not apply to the transactions at issue."  Doc. No. 64 at 30.  Plaintiff makes no argument and identifies no facts in opposition.  *See generally* Doc. No. 81.

"By its very terms, the FCBA's billing error section applies solely to creditors of open end credit plans."  *Roybal v. Equifax*, 405 F. Supp. 2d 1177, 1180 (E.D. Cal. 2005). "An open end credit plan is one where the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance.  All credit that is not characterized as open end is considered closed end."  *Id.* at 1180 n.3 (citing 15 U.S.C. 1602(I); 12 C.F.R. § 226.2(a)(10)).  Here, the Loan does not fit that description.  Instead, the Loan involves a single transaction not covered under the FCBA: a sum to be repaid on a fixed schedule.  *See, e.g.*, *Graham v. Wilmington Sav. Fund Soc'y, FSB*, No. CV 18-00456 LEK-KJM, 2020 WL 2561886 *8 (D. Haw. May 20, 2020) (home mortgage loans); *Peart v. Shippie*, No. 08-60793-CIV, 2008 WL 11332042

*4 (S.D. Fla. Nov. 10, 2008), *aff'd in part and vacated in part, on other grounds*, 345 F. App'x 384 (11th Cir. 2009) (auto loans).

As Plaintiff seemingly concedes that the Loan is not the type of credit covered by the FCBA, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff's FCBA claim (Claim 5).

## G.    California Penal Code section 530.8 – Claim 6

Defendant NFCU moves for summary judgment on Plaintiff's final cause of action, violation of California Penal Code § 530.8, arguing that it has provided him all the information required under the law in a timely manner. Doc. No. 64 at 31–32. Plaintiff disagrees. Doc. No. 81 at 31–32.

Under California law:

> if a person discovers that an application in their name for a loan . . . has been filed with any person or entity by an unauthorized person . . . then, upon presenting to the person or entity with which the application was filed or the account was opened a copy of a police report prepared pursuant to [§] 530.6 or a copy of a signed and submitted [FTC] identity theft report and identifying information in the categories of information that the unauthorized person used to complete the application or to open the account, the person . . . shall be entitled to receive information related to the application or account, including a copy of the unauthorized person's application or application information and a record of transactions or charges associated with the application or account.

> Upon request by the person in whose name the application was filed . . . the person or entity with which the application was filed shall inform them of the categories of identifying information that the unauthorized person used to complete the application or to open the account. The person or entity with which the application was filed . . . shall provide copies of all paper records, records of telephone applications or authorizations, or records of electronic applications or authorizations required by this section . . . within 10 business days of receipt of the person's request and submission of the required copy of the police report or [FTC] identity theft report and identifying information.

Cal. Pen. Code § 530.8(a). "Any request made pursuant to subdivision (a) . . . shall be in writing . . . ." *Id.* at 530.8(b).

The parties do not dispute that Defendant NFCU "received a letter from Plaintiff explaining the incident, dated August 30, 2023. Plaintiff attached the police report and a Federal Trade Commission report to this letter," though they dispute Plaintiff attached any additional information. DSS No. 22. Plaintiff provided, at minimum, a narrative explaining when the Loan was taken out, his recollection of the events leading up to and following the Loan application, and why he believes it was fraudulent. *See* Doc. No. 67-7. Plaintiff also included his FTC report regarding the loan and the Police Records. *Id.* Plaintiff's offered version of the letter also includes a portion of his Declaration of Forgery/Fraud, what appears to be a transaction history with related IP addresses, and the ePromissory note. Doc. No. 81-2 at 18–30. Comparing the two documents, a reasonable jury could find that Plaintiff provided "a copy of a police report prepared pursuant to Section 530.6 or a copy of a signed and submitted Federal Trade Commission (FTC) identity theft report and identifying information in the categories of information that the unauthorized person used to complete the application or to open the account, the person" sufficient to invoke the requirements of § 530.8.

Next, Defendant NFCU argues that because its agent helped Plaintiff to find the ePromissory note on that same date, it has satisfied its obligation under the law. Doc. No. 64. The parties do not appear to dispute that Plaintiff located the ePromissory note after this call. *See* DSS No. 21; Plf. Decl. ¶ 12. However, Plaintiff declares that he never received the actual loan application, and that the ePromissory note only displayed the "date, time[,] and IP address used to fill out the loan." Plf. Decl. ¶ 12. Defendant NFCU does not dispute that it did not provide Plaintiff with the actual application, or provide evidence that this application does not exist,[26] but instead argues that Plaintiff misreads the law, which requires only what it provided Plaintiff: the ePromissory note with the "underlying loan information." The law states, however, that plaintiff "shall be entitled to receive information related to the application or account, including a copy of the

---

[26] Indeed, evidence indicates that such a document does exist. *See* Freeman Depo. Tr. 53:20–57:3.

unauthorized person's application or application information." Cal. Pen. Code § 530.8(a). Thus, a jury could still determine that Defendant NFCU did not provide all the documents or information required by law.

Defendant NFCU also relies heavily on Plaintiff's statement, during his phone call with NFCU on August 30, 2023, that "[t]his is what I need. This is perfect. Thank you," Doc. No. 68-7; *see also* Doc. No. 68-6, to argue that Plaintiff admits that Defendant NFCU satisfied its duties. *See* Doc. No. 64 at 32; Doc. No. 82 at 11. But viewing the evidence in Plaintiff's favor, a jury could nevertheless find that NFCU did not meet its statutory obligation. Therefore, the Court **DENIES** Defendant NFCU's motion as to Plaintiff's California Penal Code § 530.8 claim (Claim 6).

## V. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant NFCU's motion for summary judgment. As discussed above, the Court **GRANTS** Defendant NFCU's motion as to Plaintiff's claims under the RFDCA (Claim 3) and the FCBA (Claim 5). The Court further **DENIES** Defendant NFCU's motion as to Plaintiff's CITA claim (Claim 1) to the extent discussed. The Court **DENIES** the remainder of Defendant NFCU's motion.

As the remaining claims must proceed to trial, the Court will issue a separate pretrial scheduling order setting all pertinent deadlines and hearings, including a trial date, in due course.

**IT IS SO ORDERED**.

Dated: April 14, 2025

HON. MICHAEL M. ANELLO
United States District Judge